# **EXHIBIT 6**

# Receiverships in the Real Estate Setting

By Hon. Mark A. Goldsmith and Gregory J. DeMars

## Introduction

Receivers are a valuable and varied construct of the law. Although receivers do not exercise judicial powers in the strict sense, they are not, on the other hand, limited to performing purely ministerial functions. Rather, they represent an administrative extension of the appointing court, with the power to affect substantially the rights, liabilities, and interests of all parties with whom they interact within the constraints of their appointment. A receivership may be flexibly designed to protect a broad array of both liberty[1] and property[2] interests. As such, these powerful appendages of the court may be created in many different contexts, reflecting the limitless types of disputes that roil humankind.[3]

This article focuses on receiverships in the real estate setting. In particular, we analyze the considerations that should be taken into account by real estate lenders, borrowers, and other stakeholders in determining whether to seek or oppose a receivership when a real estate lending relationship becomes financially distressed. In so doing, we also explore how courts typically analyze requests for appointment of a receiver under Michigan law. From this analysis, the parties can fashion strategies to advance their respective positions.

## The Borrower and Lender's Clash of Interests

A principal concern of a real estate lender is the preservation of collateral. When financially distressed, the borrower may be unable or unwilling to take the measures necessary to preserve the collateral's value. Although borrowers will not typically intentionally take measures that diminish the collateral's value, they may lack the resources to make necessary repairs, retain effective management, or pay taxes and insurance. All such acts of neglect may have a significant impact on the value of collateral.

In many cases, the neglect will be part and parcel of the borrower's inability to maintain debt service. In these situations, the lender can avail itself of the usual remedies of workouts, foreclosures, deeds in lieu of foreclosure, and suits on the debt or guarantees.

However, these options often take time to play out. A foreclosure by advertisement, for example, will require several weeks of publication, followed by a sale and expiration of the redemption period—approximately seven months—before the lender will be in complete control of the property.[4] Where the value of the property is plummeting due to the borrower's neglect, the lender simply does not have the luxury of time.

A receivership offers the lender the benefit of immediate possession and control of the property and the rents where applicable. Depending on the circumstances, a receiver can be appointed almost immediately upon the filing of a lawsuit, thereby putting someone in possession who will protect the lender's interests. The receiver will have broad powers, not only to prevent future deterioration of the property, but also to reverse prior bad management decisions.[5]

From the borrower's perspective, the appointment of a receiver may well prove a disaster. The borrower loses control of the property, including available cash flow. The receiver's compensation and expenses will be added to the mortgage debt, making the borrower's repayment task harder and the likelihood of any foreclosure deficiency greater. The borrower's credit rating will be adversely impacted. In all likelihood, defaults may automatically be triggered under covenants in loan documents with other lenders.

This clash of interests often provides the necessary impetus to a negotiated settlement between lender and borrower. However, when compromise cannot be achieved—or when time is needed to explore whether a compromise can be achieved—how will a court evaluate the lender's request for the appointment of a receiver? The careful lawyer must be aware of, and consider, a number of issues, including history, doctrine, and practice.

## General Principles of Receivership Law

At the outset, it is important to recognize that receiverships are a creature of equity jurisdiction. In Michigan, it has long been

recognized that courts have inherent equitable authority to appoint receivers.[6] As such, Michigan follows the common law tradition, which stretches back several hundred years to the equitable authority of England's chancery courts to appoint receivers.[7]

This common law authority has been recognized in statutory law: "Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law."[8] Notably, this language has been construed as not constituting an independent grant of authority.[9] Rather, the phrase "where appointment is allowed by law" is a legislative acknowledgement of the court's power to appoint receivers in two distinct situations: (1) where a statute specifically provides for the appointment of a receiver, and (2) "where the facts and circumstances render the appointment of a receiver an appropriate exercise of the circuit court's equitable jurisdiction."[10]

Because equity provided a broad sweep of power for the appointment of receivers, it also fashioned restraints to avoid abuses. For this reason, the doctrine developed that the appointment of a receiver is considered a "drastic" remedy, and that receivers should be utilized only in extreme cases.[11] Further, a receivership should not be utilized where "less intrusive means" are available to achieve the relief requested. [12] As a further harness against an unbridled appointment power, courts are admonished to require some proof that prior efforts have been made to accomplish relief through means other than a receiver and that they have been found wanting.[13] Still another limiting principle is that receiverships must be ancillary to a legal action, unless otherwise allowed by statute or case law.[14] In other words, a party may not simply file a complaint requesting a receiver. Instead, the party must plead a cognizable cause of action and request a receiver as part of the relief.

In seeking appointment of a receiver, the lender's lawyer will emphasize the broad grant of power by which courts are given great authority to correct or prevent injustices. The borrower's lawyer will emphasize the wariness with which courts are admonished to approach appointment of a receiver. Obviously, the ultimate decision will depend on the sound exercise of the trial court's discretion.[15]

## Waste

The circuit court's exercise of discretion is not performed in an historic vacuum. Courts have long recognized certain recurrent real estate contexts in which the appointment of a receiver is often deemed appropriate. One such context is waste—threatened or actual—of the real property. Any act that wrongfully diminishes the value of the collateral is considered waste.[16] Waste has traditionally been a circumstance justifying appointment of a receiver.[17]

However, what constitutes waste has been the subject of some dispute historically. Physical damage or neglect of property has unquestionably been deemed waste.[18] Less tangible assaults on property rights have also justified appointment of a receiver. For example, a receiver was appointed "for the purpose of preserving the property," where the mortgagee contended that a railway company's refusal to comply with the city's demand for track improvements would threaten the value of the mortgaged property as well as risk loss of the franchise to operate the railway.[19] Even mismanagement by the borrower of its affairs, without any allegations of bad faith, can justify appointment of a receiver to preserve the value of the collateral.[20]

A recurrent instance of waste in the real estate context is the non-payment of taxes and insurance. Over the years, the law's approach has evolved. Prior to 1937, the possibility that title to real property might be lost through a tax sale for non-payment of taxes was not considered a threat justifying appointment of a receiver unless the tax sale was imminent or likely to occur prior to the expiration of the statutory redemption period.[21] To address the threat that this common law principle posed to real estate lenders, the Michigan Legislature, in 1937, enacted a statute that permitted parties to define waste in their mortgage documents to include non-payment of taxes and insurance.[22] The statute expressly allowed the lender to seek appointment of a receiver, even when there was no imminent threat of a tax sale.[23]

Although the statute permits the parties to define waste in their mortgage documents, a court is not bound to appoint a receiver based simply on the parties agreement. Typically, courts will analyze a variety of factors to determine whether appointment of a receiver is appropriate, including: the amount of unpaid taxes and insurance; the length of the past due period; the value of the mort-

> In seeking appointment of a receiver, the lender's lawyer will emphasize the broad grant of power by which courts are given great authority to correct or prevent injustices.

gaged property; the likelihood of a deficiency following sale; whether the deficiency is likely collectible from the mortgagor or guarantors; whether the mortgager has been guilty of misconduct or mismanagement, such as misappropriation of rents; and whether the mortgage documents provide for the appointment of a receiver (which they invariably do).

The waste statute also includes a broad grant of powers to the receiver: "Subject to the order of the court, the receiver may collect the rents and income from such property and shall exercise such control over such property as to such court may seem proper."[24] This sweeping language authorizes the court to place the receiver into a position of actively managing the property and collecting the income from the property in order to guard against threats to the value of the collateral occurring because of the failure to pay real estate taxes and/or insurance premiums.

Because a substantiated claim of statutory waste carries with it, as a practical matter, a certain presumption in favor of appointing a receiver, the lender's lawyer will avidly explore the availability of that ground as an initial matter. Non-statutory waste is typically a more debatable proposition and may require the opinion of an expert to support such grounds. Excessive deferred maintenance or mismanagement is often more of a judgment call, and thus a more difficult ground upon which to prevail in court. For the same reason, the borrower will seek to avoid statutory waste. To the extent a cash-strapped borrower must select which bills to pay and which expenses to defer, the borrower will make sure that taxes and insurance receive high priority on the payables ledger, thereby making it more difficult for the lender to prevail on a motion for appointment of a receiver.

## Assignment of Rents

Another route to the appointment of a receiver is by way of an assignment of rents. As noted above, the waste statute authorizes the appointment of a receiver for purposes of collecting the rent. However, even in the absence of statutory waste, the law permits the appointment of a receiver to collect the rents.

MCL 554.231 authorizes the parties to enter into an assignment of rents, under which the borrower assigns the rents as security for the loan.[25] The assignment is not a mortgage of the rents; thus, no foreclosure proceeding is required to perfect the lender's interest in the rents.[26] Rather, the assignment becomes effective against the borrower immediately upon default and without notice. The implication of this principle is that the rents become the property of the lender immediately upon default, rendering the borrower's use of the rents a conversion of the lender's property.[27]

While the rents become the lender's property immediately upon default, the assignment does not become effective against tenants until certain statutory requirements are fulfilled. Specifically, the lender must record a notice of the default under the mortgage with the register of deeds and serve a copy of the notice and the assignment on the occupiers of the mortgaged property.[28]

Although the statute does not, by its terms, provide for the appointment of a receiver, caselaw makes clear that where an assignment of rents is properly invoked the appointment of a receiver is appropriate. The seminal decision for appointment of a receiver in the context of collecting rents is *Smith v Mutual Benefit Life Ins Co.*[29]

In *Smith*, the court reviewed the history of assignments of rents, noting that prior to 1843, mortgagees were entitled to possession and collection of the rents until expiration of the redemption period. In that year, the Legislature enacted legislation that barred mortgagees from taking possession until their title had become absolute, i.e. until after expiration of the redemption period without the right to redemption having been exercised. In 1925, the Legislature reversed course as to trust mortgages (a form of bonds), allowing the mortgagee to take possession and collect rents before expiration of the redemption period. Similar legislation was enacted in 1953 with respect to real estate mortgages, the effect of which was to reinstate the pre-1843 state of the law, under which mortgagees could enter into possession before expiration of the redemption period and collect rents. After reviewing this history, the *Smith* court held that where a mortgagee has entered into an assignment of rents, it is entitled, in an appropriate case, to the appointment of a receiver to collect the rents (arguably pre- and post-foreclosure).

After default, the lender has a right to collect the rents (if the lending documents so provide) and may also have a persuasive case for seeking appointment of a receiver. Nonetheless, a careful examination of a number of issues is required before deciding to

*MCL 554.231 authorizes the parties to enter into an assignment of rents, under which the borrower assigns the rents as security for the loan.*

invoke the assignment of rents and to seek appointment of a receiver.

One such issue is what the tenant's response will be to receiving a notice from the lender to pay it, rather than the landlord. As a practical matter, tenants may be confused by such a demand and may be slow or unwilling to pay a rival claimant for their rent check. Reduced cash flow may translate into further deterioration of the property and remove any hope of a work-out with the borrower. Even if tenants properly pay the lender, the result will be that the borrower will be stripped of funds and the lender will have to undertake the management responsibilities previously exercised by the borrower. These management expenses will have to be paid prior to the lender using the rents to pay off the mortgage debt. Where the borrower's management history is less than stellar, the lender's assumption of management may be welcome. However, if the property has not been mismanaged and there are no concerns about defalcations, the lender will have to think twice about replacing management.

If the lender determines that it is prudent to invoke the assignment of rents provision, the next decision is whether to seek appointment of a receiver. As a practical matter, in the absence of a demand from a court-appointed receiver for payment of rent, tenants may not pay rent at all. A receiver, as a court-appointed official, carries the court's official imprimatur and promotes payment in accordance with the law. Thus, a lender may determine that the expense of a court action, as well as the receiver's compensation and expenses, can be justified by the increased cash flow that the receiver will produce, or that such action is necessary to stop the "milking of rents."

On the other hand, as noted above, the borrower may well want to resist the appointment of a receiver for a number of valid reasons: losing possession and control of the property, damage to the borrower's credit, and the additional expense of the receiver's fees and expenses, which will likely become part of the mortgage debt. However, where the lender has decided to invoke the assignment of rents, the borrower may well want a receiver appointed because a receiver ensures that the rents are properly applied to insurance, taxes, maintenance, accrued interest on the debt, and any deficiency following foreclosure. Because the receiver is court appointed, the borrower can ensure some modicum of control by having the right to challenge the receiver's actions in court. Without a receiver, the lender has much more freedom of action in terms of applying the rents. Appointment of a receiver can also facilitate an orderly management of the property, while the lender and borrower negotiate a work-out, or until the foreclosure sale can be completed, or until the borrower can market the property and pay off the debt.

## Expense

Assuming the statutory and/or equitable considerations warrant appointment of a receiver, the lender must still take into account the additional layer of expense that a receivership may entail.

Typically, mortgage documents provide that the receiver's fees and expenses will be paid by cash flow, if it is sufficient, or borne by the borrower and added to the mortgage debt. However, aside from contractual considerations, the law has developed several principles regarding a receiver's compensation that provide judicial gloss to the contract terms. A receiver is entitled to reasonable compensation as well as expenses necessarily incurred by the receiver, as determined in the discretion of the court.[30] The general rule is that fees and expenses will be a charge on the receivership property and be paid out of such property.[31] To the extent there is no receivership property, or it is inadequate to pay the receiver's fees and expenses, the receiver has an equitable claim for such fees and expenses against the party seeking the appointment of the receiver.[32]

Even where the receiver would otherwise be entitled to compensation, it is subject to disallowance. Where the receiver has a substantial interest in the property, it is not an abuse of discretion for the court to disallow compensation.[33] Where the receiver has neglected its duty—by failing to account for property or funds or by failing to file requisite reports—the court may disallow or reduce the receiver's claim for compensation.[34] Similarly, if the receiver is guilty of neglect of duty, compensation may be reduced or denied.[35]

Another expense consideration is less tangible, but nonetheless real: the liability exposure for a receiver's actions. If a receiver goes into possession, his actions may subject him—and, through principles of contract, the lender or an insurer—to potential liability. The following should be considered in evaluating this exposure risk.

Appointment of a receiver can also facilitate an orderly management of the property…

The law is not wholly clear on what standard of care applies to the receiver's actions. Older authority suggests that no special rules of substantive liability apply as a result of the receiver's status. For example, in *Gutsch v McIlhargey*[36], the court held that the receiver was personally liable for his torts (apparently conversion) when he had secured levy of replevin on property owned by the wife of the judgment debtor to satisfy a judgment owed by her husband. The court baldly stated that the receiver's "official character ought not to be a defense to his tortious action, or deprive parties of their rights."[37] Similarly, in *Kenney v Ranney*,[38] the court upheld an action in tort against a receiver who had been appointed in connection with the judicial foreclosure of a mortgage, even though the receiver claimed to have sold the plaintiff's property in the good faith belief that it was subject to the mortgage. The court held that it was no defense that the receiver believed that he had authority to sell the property.[39]

More recent cases have held that a receiver may be sued in tort only when it is alleged that he or she acted in bad faith. In a recent published decision, *In Re Motion for Leave to Sue the Receiver of Venus Plaza Shopping Center*[40], the Michigan Court of Appeals affirmed the trial court's denial of leave to sue the receiver for failure to discharge his duty to operate the receivership property in accordance with the receivership order. The court held that the law required "an element of bad faith when suing court-appointed receivers for actions taken and events occurring during the receivership." In reaching its decision, the court relied on *In re Hudson*,[41] in which the Michigan Supreme Court had held that despite errors in judgment, the receiver had demonstrated good faith in arranging for a sale of receivership property and, consequently, was entitled to full fees and no exposure for personal liability.[42]

*Venus Plaza* does not expressly discuss the older line of cases, but it does point out that an "operating receiver" (i.e. one involved in the on-going operation of a business) is entitled to greater deference than a "passive receiver" (i.e. one who simply liquidates property).[43] It may be that the way to harmonize these cases is along the operating receiver/passive receiver divide.

Another issue bearing on liability exposure is the principle that a receiver may not be sued without leave of the appointing court. A receiver is deemed to be an officer of the court that appointed him.[44] As a consequence, it has long been the law that no one may bring suit against the receiver except with the permission of the appointing court.[45] Courts have stated, without much elaboration, that the justification for the rule is the avoidance of inconsistent verdicts and multiplicity of actions.[46] There is a contrary line of cases, not expressly overruled, holding that leave of court is not required where the suit alleges the receiver has committed a tort in the course of performing his duties, such as converting the plaintiff's property.[47]

Given the overwhelming authority supporting the principle that leave of court is required, anyone filing suit without first obtaining leave is likely to find the action dismissed. Further, the motion for leave to sue will give the receiver an opportunity to address the merits of the proposed suit, thereby enabling the receiver to launch a pre-emptive strike before having to defend a full-dress suit.

The lender considering the appointment of a receiver must take into account the expense of a receivership and available cash flow from the property. That expense includes the quantifiable, out-of-pocket expense of fees and costs, but also the exposure to possible receivership liability. The more extensive the receivership contemplated—in terms of time and management responsibilities—the greater the risk of exposure. For the borrower, the receiver's potential liability forms the basis for additional leverage in its negotiations with the lender.

## Conclusion

The decision to seek or oppose a receivership is often not cut-and-dried. Lenders and borrowers must carefully analyze their respective interests and evaluate whether a receiver promotes or impedes those interests, including the risks that each course of action carries with it. Courts will have their own perspective, based on whether the circumstances of a particular case fall within statutorily cognizable categories or satisfy an individual judge's sense of fairness. Armed with history, the applicable law, and knowledge of the strategic choices at issue, the careful lawyer will assist the client in making an informed decision on whether a receivership is the best solution for a financially distressed relationship and in assessing the likelihood that a court will agree with that judgment.[48]

> More recent cases have held that a receiver may be sued in tort only when it is alleged that he or she acted in bad faith.

## NOTES

1. For example, in *Wayne County Jail Inmates v Wayne County Chief Executive Officer*, 178 Mich App 634, 444 NW2d 549 (1989), a receiver was appointed to manage a county jail after many years of neglect and disregard of court-ordered reforms.

2. *See, eg, Cohen v Cohen*, 125 Mich App 206, 214, 335 NW2d 661 (1983) ("The primary purpose of a receiver is to preserve property and to dispose of it under the order of the court."), citing *Westgate v Westgate*, 294 Mich 88, 91, 292 NW 569 (1940).

3. Even a cursory review of statutory law confirms that receivers may be appointed in numerous areas of law, common and arcane: insurance, MCL 500.8121; veterans affairs, MCL 35.273; sewage disposal bonds, MCL 41.348; zoning, MCL 125.535; industrial development bonds, MCL 125.1257; cemeteries, MCL 328.233; hospitals, MCL 331.8e; consumer protection, MCL 445.910; banking, MCL 487.12406; divorce, MCL 552.27; condominiums, MCL 559.203b; prisoner reimbursement, MCL 800.404a…to name just a few.

4. A judicial foreclosure will take longer to complete – a minimum of 13 months – if there are no contested issues.

5. Even where the corporation is solvent, courts may appoint a receiver with the full power to act on behalf of the corporation. *See, eg, In re Detroit Properties Corp*, 254 Mich 523, 530, 236 NW 850 (1931)("'The receiver of a corporation, conducting its business, takes the place of the corporation and its officers for the purpose of performing the necessary corporate duties and functions, and has the same powers for such purposes….'") quoting 14-A C J p. 1005.

6. *Michigan Minerals Inc v Williams*, 306 Mich 515, 525-527, 11 NW2d 224 (1943); *Grand Rapids Trust Co v Carpenter*, 229 Mich 491, 493-494, 201 NW 448 (1924); Ralph v Shiawassee Circuit Judge, 100 Mich 164, 169, 58 NW 837 (1894); Corliss v Clinton Circuit Judge, 212 Mich 476, 483,180 NW 478 (1920); *National Bank of Commerce v Corliss*, 217 Mich 435, 437-438, 186 NW 717 (1922).

7. *Petitpren v Taylor School District*, 104 Mich App 283, 294, n9, 304 NW2d 224 (1981).

8. MCL 600.2926.

9. *Petitpren, supra* n 7, 104 Mich App at 294.

10. *Id.* The *Petitpren* decision is a good illustration of the broad reach of equity to appoint a receiver. In that case, the suspended superintendent of a school district brought suit seeking reinstatement. At a show cause hearing to determine whether the superintendent should be reinstated, the school district's counsel's argument included reference to the deteriorating financial condition of the school district, prompting the trial court to appoint a receiver. On appeal, the Court of Appeals upheld the trial court's broad authority to appoint a receiver, even though there was no specific statutory grant of authority. Although it ultimately reversed the lower court's ruling, it instructed that circuit courts have broad equitable jurisdiction to appoint receivers where the circumstances render the appointment "an appropriate exercise of the circuit court's equitable jurisdiction." *Id.* at 294.

11. *Michigan Minerals Inc v Williams,* supra n 6, 306 Mich at 525; *Jenks v Horton*, 96 Mich 13, 16; 55 NW 372 (1893); *Hosner v Brown*, 40 Mich App 515, 536, 199 NW2d 295 (1972); *Korash v Livonia*, 388 Mich 758, 202 NW2d 803 (1972).

12. The case often cited for this proposition is *People v Israelite House of David*, 246 Mich 606,225 NW 638 (1929), where the attorney general brought an action for abatement of a nuisance and appointment of a receiver to manage property that had been donated to a religious organization that the state alleged was perpetrating a fraud on unsuspecting adherents. The Supreme Court upheld an injunction to abate the nuisance of various improper activities, but held that a receivership should not be appointed, given that the injunction was sufficient to address the state's legitimate concerns.

13. *Petitpren, supra* n 7 illustrates this principle by its reversal of the receivership order entered in that case. The Court of Appeals found that the trial court had not attempted other methods to achieve financial stability for the school district "short of receivership nor was the possibility of other less drastic approaches adequately explored." 104 Mich App at 298.

14. *National Lumbermans Bank v Lake Shore Machinery Co*, 260 Mich 440, 443, 245 NW 494 (1932); *Francis Martin Inc v Lomas*, 62 Mich App 706, 710, 233 NW2d 702 (1975).

15. *Singer v Goff*, 334 Mich 163, 167, 54 NW 290 (1953); *Michigan Minerals Inc v Williams*, 306 Mich 515, 528, 11 NW2d 224 (1943)].

16. *Nusbaum v Shapero*, 249 Mich 252,263, 228 NW 785 (1930)("Anything that tends to destroy the security is 'waste'").

17. *Id.* at 265.

18. R. Clark, *A Treatise on the Law and Practice of Receivers* (3d ed 1959) Vol I, Sec 178 at 261-262 ("The general equity ground for the appointment of a receiver is, therefore, that the property in dispute is in danger of loss, destruction, deterioration, or other impairment of its value through the neglect, waste, misconduct or other acts or failure to act on the part of the defendant or others who are holding the property.").

19. *Union Street Railway v Saginaw*, 115 Mich 300, 73 NW 243 (1897).

20. *Ralph v Shiawassee Circuit Judge*, 100 Mich 164, 58 NW 837(1894).

21. *Union Guardian Trust Co v Rau*, 255 Mich 324, 238 NW 166 (1931).

22. MCL 600.2927(1) provides: "The parties to any mortgage, trust mortgage, or deed of trust of real property, or any extension thereof, may, by agreement therein contained to that effect, provide that the failure of the mortgagor or grantor, as the case may be, to pay any taxes assessed against such property or installments thereof, in the event said taxes are being paid under the provisions of Act No. 126 of the Public Acts of 1933, as amended, or any insurance premium upon policies covering any property located upon such premises constitutes waste."

23. MCL 600.2927(2) provides: "If such mortgagor or grantor in such instrument fails to pay such taxes or insurance premiums upon property subject to the terms of a mortgage, trust mortgage, or deed of trust containing such agreement the circuit court having jurisdiction of such property may, in its discretion upon complaint or motion filed by such mortgagee, grantee, assignee thereof or trustee under such instrument and upon such notice as the court may require, appoint a receiver of the property for the purpose of preventing such waste. Subject to the order of the court, the receiver may collect the rents and income from such property and shall exercise such control over such property as to such court may seem proper." The statute contains an exception for an owner-occupied dwelling house or farm, as well as a store or business property having an assessed valuation of $7,500 or less. MCL 2927(3).

24. MCL 600.2927(2).

25. MCL 554.231 provides: "Hereafter, in or in connection with any mortgage on commercial or industrial property other than an apartment building with less than 6 apartments or any family residence to secure notes, bonds or other fixed obligations, it shall be lawful to assign the rents, or any portion thereof, under any oral or written leases upon the mortgaged property to the mortgagee, as security in addition to the property

described in such mortgage. Such assignment of rents shall be binding upon such assignor only in the event of default in the terms and conditions of said mortgage, and shall operate against and be binding upon the occupiers of the premises from the date of filing by the mortgagee in the office of the register of deeds for the county in which the property is located of a notice of default in the terms and conditions of the mortgage and service of a copy of such notice upon the occupiers of the mortgaged premises."

26. *Smith v Mutual Benefit Life Ins Co,* 362 Mich 114, 124, 106 NW2d 515 (1960).

27. *In Re PPG Properties*, 55 BR 864, 869-870 (Bankr ED Mich 1985). While this analysis stands under Michigan law, such treatment of rents may be different in a bankruptcy setting. See *In Re Mount Pleasant Ltd Partnership*, 144 BR 727 (Bankr WD Mich 1992). Such analysis is not possible due to the space constraints of this article.

28. *In Re PPG Properties, supra*, n 27.

29. 362 Mich 114, 106 NW2d 515 (1960).

30. *Fisk v Fisk*, 333 Mich 513, 517, 53 NW2d 356 (1952).

31. *Id.* at 516; *Preston Nat'l Bank v Emerson*, 102 Mich 462, 468, 60 NW 981 (1894).

32. *Kimmerle v Dowagiac Mfg Co*, 105 Mich 40, 41, 63 NW 529 (1895). *See also* MCR 2.622 for rules pertaining to fees and expenses of receivers appointed in supplementary proceedings following entry of a judgment.

33. *Hughes v Dungy*, 339 Mich 348, 355, 63 NW2d 422 (1954).

34. *Horvath v Vasvary*, 246 Mich 231, 234, 224 NW365 (1929).

35. *In re Angell*, 131 Mich 345, 350, 91 NW 611 (1902).

36. 69 Mich 377, 37 NW 303 (1888).

37. *Id.* at 379.

38. 96 Mich 617, 55 NW982 (1893).

39. *Id* at 618.

40. 228 Mich App 357, 579 NW2d 99 (1998).

41. 258 Mich 176, 241 NW 868 (1932).

42. *Id.* at 183 and *In re Hudson*, 266 Mich 274, 253 NW 295 (1934).

43. *Venus Plaza, supra* n 40, 228 Mich App at 361, citing *Morley v Snow, Circuit Judge*, 117 Mich 246, 250, 75 NW 466 (1898).

44. *Cohen v Bologna*, 52 Mich App 149, 151, 216 NW2d 586 (1974).

45. *Id.* at 151-152; *Venus Plaza, supra* n 40, 228 Mich App at 359; *In re Chaffee, 262 Mich 291, 293, 247 NW 186 (1933). See also Burk v Muskegon Machine & Foundry Co,* 98 Mich 614, 616, 57 NW 804 (1894); *In re Guarantee Indemnity Co*, 256 Mich 671, 240 NW 78 (1932). *Manchure v Wayside Oil Corp*, 259 Mich 667, 668, 244 NW 224 (1932); *Citizens' Savings Bank v Ingham Circuit Judge*, 98 Mich 173, 177, 57 NW 121 (1893); *Petition for Appointment of a Receiver for Peoples State Bank*, 51 Mich App 421, 431-432, 215 NW2d 722 (1974).

46. *Cohen, supra* n 44, 52 Mich App at 151-152.

47. *Kenney v Ranney*, 96 Mich 617, 55 NW982 (1893).

48. Due to space constraints, this article has not addressed the important related context of appointment of receivers in construction cases. The Michigan Construction Lien Act, MCL 570.1122 et seq, prescribing special rules for such cases, should be consulted.



*Hon. Mark A. Goldsmith was appointed to the Oakland County Circuit Court bench in 2004, having previously served as a magistrate of the 45-B District Court. Prior to his appointment to the circuit court bench, he was a partner at Honigman Miller Schwartz and Cohn. He graduated from the University of Michigan in 1974 with high distinction and high honors in economics in 1974, and he graduated cum laude from the Harvard Law School in 1977. He is the immediate past president of the Federal Bar Association Eastern District of Michigan Chapter and served for many years as that organization's pro bono chair, receiving a certificate of recognition from the U.S. District Court., E. D. Michigan for his pro bono involvement. He is currently a member of the executive board of Wayne State University's Center for the Study of Citizenship and a member of the Fair Housing Advisory Board of Legal Aid and Defender Association, Inc. He helped establish the Circle of Friends (teaching language and acculturation skills to immigrants) and has served on the board of Forgotten Harvest (a distributor of food to the needy) and on the regional advisory board of the B'nai B'rith Anti-Defamation League. An author of the Michigan Bar Journal's "Federal Opinion Notes – Eastern District," he has served as a special counsel to the State Bar Committee on the Unauthorized Practice of Law, a hearing panelist on the Attorney Discipline Board and as an adjunct instructor at Wayne State University Law School.*



*Gregory J. DeMars of Honigman Miller Schwartz & Cohn LLP is a partner in the real estate, affordable housing, gaming and hospitality, tribal sovereignty and development, and municipal bond and public finance departments. He advises and represents individuals and businesses in all types of business work outs, foreclosures, joint venture arrangements, multifamily debt and equity financing, real estate transactions, and in real estate financing through mortgage and other secured and asset-based lending. graduate of Wayne State University Law School, he is listed in the 2007 Michigan Super Lawyers. Chambers USA America's Leading Lawyers 2008, he is recognized among the leading practitioners in real estate in Michigan.*